Exhibit A

FILED
02-05-2018
CIRCUIT COURT
DANE COUNTY, WI
2018CV00320
Honorable Richard G Niess
Branch 9

STATE OF WISCONSIN :   DANE COUNTY BRANCH _____   :   CIRCUIT COURT

---

SUSAN NIELEN-THOMAS,
5512 Highway N
Sun Prairie, WI 53590,

On behalf of herself and all
Others similarly situated,

           Plaintiffs,

vs.

CONCORDE INVESTMENT SERVICES, LLC,
19500 Victor Parkway, Suite 550
Livonia, MI 48152

FORTUNE FINANCIAL SERVICES, INC.,
3582 Brodhead Rd., Suite 202
Monaca, PA 15061

TD AMERITRADE, INC.,
200 S. 108th Ave.
Omaha, NE 68154

WISCONSIN RIVER BANK,
608 Phillips Blvd.
Sauk City, WI 53583-0636,

JEFFREY L. BUTLER,
1710 Wildlife Dr.
Kewaskum, WI 53040,

       and

WISCONSIN INVESTMENT SERVICES LLC,
185 Knights Ave.
Kewaskum, WI 53040,
          Defendants.

Case No. _____
Case Code: 30301
JURY TRIAL DEMANDED

---

**Class Action Complaint**

---

1

Plaintiff Susan Nielen-Thomas ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendants Concorde Investment Services, LLC ("Concorde"), Fortune Financial Services, Inc. ("Fortune"), TD Ameritrade, Inc. ("Ameritrade"), Wisconsin River Bank, Jeffrey L. Butler, and Wisconsin Investment Services LLC (collectively, "Defendants"). Plaintiff states as follows in support of her Class Action Complaint:

### Nature of the Action

1. Plaintiff brings this action for violation of the Wisconsin and Nebraska Securities Acts, Wisconsin Statute Section 100.18 ("Fraudulent Representations"), breach of contract, fraud, negligence, failure to supervise, breach of fiduciary duty, and breach of the Securities Act of 1933.

2. Plaintiff brings these claims in connection with Defendants' improper and fraudulent sales and supervision of Plaintiff's investment account, as well as the investment accounts of all other similarly situated investors.

3. Plaintiff and the putative Class were all investment advisory clients of Jeffrey Butler and his state-registered investment advisory firm, Wisconsin Investment Services LLC (hereinafter, Jeffrey Butler and Wisconsin Investment Services LLC are collectively referred to as "Butler"). Butler exercised discretionary control over the accounts of Plaintiff and the putative Class, and therefore owed them a fiduciary duty to act only in their best interests.

4. Defendants, through Butler, fraudulently and negligently purchased, sold, and supervised the investment accounts of Plaintiff and the putative Class, leading to catastrophic and entirely preventable losses in their accounts. There were several aspects to Butler's complete failure to properly manage the accounts of Plaintiff and the putative Class.

5. First, contrary to the advertised trading strategy in Butler's ADV, Butler failed to create individualized investment portfolios designed to meet the unique needs and goals of each

investor. Instead, Plaintiff and the putative Class were subjected to block trades, often involving up to forty (40) investment accounts of Butler's clients at a time.

6.      Second, the trading strategy implemented by Butler and Defendants was grossly unsuitable for any retail investor, including Plaintiff and each member of the putative Class.

7.      The most egregious investment, which Butler repeatedly purchased and sold on behalf of Plaintiff and each member of the putative Class, is an exchange-traded note ("ETN") known as VXX. VXX is an unsecured debt instrument that is designed to track the movement of futures on an index that measures overall market volatility. Since its inception, VXX has averaged a yearly return of negative fifty-eight percent (-58%). Because it tracks futures of a volatility measurement, VXX is in and of itself an inherently volatile and risky investment vehicle. It is designed to be used only as a hedge, only by sophisticated, institutional investors, and only on a very short-term basis. VXX is all but guaranteed to lose money if held for an extended duration. In fact, the issuer of VXX, Barclays Bank, warns in its "Pricing Supplement" that "over the longer term … the value of futures contracts on the VIX Index will likely decrease … and the potential upside of your investment in your ETNs will correspondingly be limited as a result." In the VXX "Snapshot," Barclays provides the following chart showing the long-term performance of VXX:

ETN and Index Historical Performance



— iPath®S&P 500 VIX Short-Term Futures<sup>TM</sup> ETN   —— S&P 500 VIX Short-Term Futures™ Index TR

During that same time period depicted above, from January 1, 2009, until today, the S&P 500 has risen approximately 300%.

8.      Despite the litany of warning signs to avoid VXX, Butler not only repeatedly purchased and sold it on behalf of Plaintiff and the putative Class, but he also allowed shares of it to sit idly in the accounts of Plaintiff and the putative Class for months on end: a guaranteed recipe for disaster.

9.      Butler also subjected Plaintiff and the putative Class to a "one-size-fits-all" investment strategy, purchasing the same few securities on behalf of many customers at once. This led to their accounts lacking proper asset allocation and diversification.

10.     Concorde, Fortune, and TD Ameritrade all had obligations to monitor and supervise Butler's trading activities for all of his customers, including the advisory customers at Wisconsin Investment Services.

11.     Jeffrey Butler was a registered broker (also known as a registered representative) with Concorde from March 2012 to May 2015, and with Fortune from July 2015 until December 2016. Under FINRA rules, both firms when Butler was registered with them, they were required to supervise Butler's investment advisory activities as if the activity was taking place at Concorde or Fortune, in the accounts of Concorde and Fortune customers. Concorde and Fortune are also liable for Butler's actions under the theory of apparent authority.

12.     Butler had an "Advisor Master Account" agreement with TD Ameritrade, which allowed him to utilize TD Ameritrade's online trading platform to execute all trades in the accounts of Plaintiff and the putative Class. Not only does TD Ameritrade's internal manual acknowledge that it owed a fiduciary duty to its clients, including Plaintiff and the putative Class, but Nebraska

4

and Wisconsin also impose a supervisory duty on TD Ameritrade. In addition, TD Ameritrade is liable under the theory of apparent authority.

13. Despite their well-established supervisory duty, none of Defendants Concorde, Fortune, or TD Ameritrade properly supervised Butler's investment advisory activities. As a result, Butler had no oversight. This led to Butler investing the accounts of Plaintiff and the putative Class as carelessly as he wanted, and gambling away significant portions of their retirement and other investment accounts.

14. Wisconsin River Bank also owed its clients a duty in recommending investment advisors. Wisconsin River Bank breached that duty by recommending Butler, whose reckless and careless investing caused Wisconsin River Bank's clients to lose substantial amounts of money. Meanwhile, Wisconsin River Bank profited from the relationship. In addition, Wisconsin River Bank is liable under the theory of apparent authority.

15. Defendants' reckless conduct and failure to discharge their duties has damaged Plaintiffs and the putative Class in excess of $1 million, but less than $5 million.

### Jurisdiction and Venue

16. This Court has jurisdiction over this matter pursuant to Wisconsin Statute Section 801.05 because Plaintiff is a Wisconsin resident, most if not all of the putative Class members are Wisconsin residents, and the majority of claims arise under Wisconsin statutory and common law.

17. Venue is proper before this Court pursuant to Wisconsin Statute Section 801.50 because a substantial part of the events or omissions giving rise to the claims occurred within Dane County, Plaintiff is a Dane County resident, and upon information and belief, many of the members of the putative Class are residents of Dane County or neighboring counties.

**Parties**

18.     Plaintiff Susan Nielen-Thomas is an adult resident of the City of Sun Prairie in Dane County, Wisconsin.

19.     Defendant Concorde Investment Services, LLC is a Michigan limited liability company with its headquarters and principal place of business in Livonia, Michigan. Butler was a registered representative of Concorde from March 2012 to May 2015.

20.     Defendant Fortune Financial Services, Inc. is a Pennsylvania corporation with its headquarters and principal place of business in Monaca, Pennsylvania. Butler was a registered representative of Fortune from July 2015 to December 2016.

21.     Defendant TD Ameritrade, Inc. is a New York corporation with its headquarters and principal place of business in Omaha, Nebraska. Butler had a contract with TD Ameritrade which permitted him to use TD Ameritrade's online trading platform to manage all of his clients' accounts. As a result, Butler caused Plaintiff and the putative Class to all open accounts with TD Ameritrade, and utilized TD Ameritrade's trading platform to execute all trades in the accounts of Plaintiff and the putative Class.

22.     Defendant Wisconsin River Bank is a state-chartered banking institution with its headquarters and principal place of business in Sauk City, Wisconsin. Butler had a referral and compensation-sharing relationship with the bank, which was commemorated in a formal agreement. Upon information and belief, Wisconsin River Bank referred clients to Butler, who in turn compensated Wisconsin River Bank twenty basis points of fees generated from each referral.

23.     Defendant Jeffrey L. Butler is an adult resident of the State of Wisconsin.

24.     Defendant Wisconsin Investment Services LLC was a registered investment advisor and a limited liability company organized under the laws of the State of Wisconsin.

Wisconsin Investment Services' registered agent office, headquarters, and principal place of business were located at 185 Knights Avenue, Kewaskum, WI 53040. Wisconsin Investment Services terminated its advisor registration for the State of Wisconsin in August 2017.

### Factual Background

I.      **Butler managed his clients' accounts en masse, executing block trades (including in VXX) for up to forty (40) accounts at a time.**

25.     Butler served as the registered investment advisor for Plaintiff and the putative Class. Most of the investment accounts which Butler managed were IRAs or another form of retirement savings.

26.     Butler used a standard "Wealth Management Agreement" with Plaintiff and the putative Class. That Agreement provided, among other things, that:

a.      Butler would "act as your discretionary investment manager" with "discretionary trading authority over your Account to buy, sell, or otherwise effect investment transactions;"

b.      Butler had an obligation to make investment recommendations "in accordance with your financial situation and investment objectives;"

c.      Butler was "authorized, without your prior consultation, to buy, sell, and trade in stocks, bonds, mutual funds, index funds, exchange traded funds, and other securities and/or contracts relating to the same, … including investing Assets in short-term money-market instruments when we deem necessary;"

d.      "To the extent that we aggregate client orders for the purchase or sale of securities, … we shall do so in accordance with applicable rules promulgated under the

Investment Advisers Act of 1940, as amended (the 'Advisers Act') and guidance provided by the staff of the Securities and Exchange Commission;"

      e.    Butler "has the discretion to invest the account(s) above in any securities specified in Wisconsin Investment Services' ADVII;" and

      f.    Butler had an obligation to make decisions or take actions "in good faith" and "with that degree of care, skill, prudence, and diligence under the circumstances that a person acting in a fiduciary capacity would use."

27.    The "ADVII" form referenced above and incorporated into Butler's "Wealth Management Agreement" is a Wisconsin Investment Services brochure that was provided to clients. No list of approved securities is included in or attached to that brochure.

28.    The "ADVII" form brochure provided by Butler does state, among other things, that:

      a.    Butler "will tailor [his] advisory services to meet an individual's needs based on documented goals and objectives of the client;"

      b.    In order to formulate investment advice and strategies, Butler "utilizes research materials provided by outside entities, corporate rating services, annual reports and prospectus;"

      c.    Butler "does not engage in investment strategies that involve significant and unusual risks or frequent trading;" and

      d.    "Client accounts are monitored on an ongoing basis."

29.    In addition to the "ADVII" form, Butler also maintained and provided Clients with the required "ADV" form, which was also incorporated into the "Wealth Management Agreement." The ADV form stated, among other things, that: (a) Butler provided "continuous and

regular supervisory or management services;" and (b) Butler did not recommend securities to advisory clients which Butler also bought and sold for himself, or recommend securities in which related persons had some ownership interest."

30.    Butler also required Plaintiff and the putative Class to sign TD Ameritrade trading agreements, authorizing Butler to act as their Investment Advisor and to exercise full discretion over their investment accounts. TD Ameritrade's Client Agreement recognized that as a fiduciary, Butler was required to act in the clients' best interests and place the clients' interests before Butler's own.

31.    Plaintiff and the putative Class paid TD Ameritrade a commission for every purchase or sale of a security that Butler made in each of their accounts.

32.    Butler also charged each client an annual account management fee that varied between approximately 1-1.5% of assets under management.

33.    Butler unilaterally made investment decisions and purchases without the prior knowledge or approval of Plaintiff and the putative Class. Indeed, Plaintiff often learned of such investments after they had been purchased (and sometimes even sold) by Butler.

34.    Most of the transactions were block purchases or sales, meaning that Butler bought or sold the same security in the accounts of many of his clients, including Plaintiff and putative Class, at the same time.

35.    Because most investments were made without Plaintiff or the putative Class' knowledge or approval, Butler inherently recommended the investments and represented that they were suitable to Plaintiff's and the putative Class' stated financial objections and risk tolerance.

9

**II.     VXX is so complex and volatile that it is an inappropriate short-term investment for retail investors, and should not be held for more than a few days by *any investor*.**

36.     An ETN is not an equity security, but rather an *unsecured debt* instrument traded on the major stock exchanges. ETNs function in some respects like a promissory note — the investor pays money to the financial institution issuing the ETN, and upon maturity, the investor receives a payment of money in return. But unlike a traditional promissory note, which regularly pays a fixed amount upon maturity plus interest, the value of an ETN upon maturity is pegged to a particular market index and subject to the creditworthiness of the issuer of the note. Therefore, an ETN is an investment on the future state of the market, or a particular aspect of the market, at the time the ETN matures, as well as a stake on the ability of the issuing bank to avoid defaulting on the note prior to maturity.

37.     VXX is the stock symbol for the Barclays Bank PLC iPath S&P 500 VIX Short-Term Futures ETN. The VXX is tied to a spread of short-term futures contracts related to the Chicago Board Options Exchange (CBOE) Volatility Index (ticker symbol VIX), a popular measure of the implied volatility of the S&P 500 index. The VIX represents one measure of the market's expectation of stock market volatility over the next 30-day period, and is often referred to as the "fear index."

38.     In short, the value of the VXX note is derived from futures contracts on the VIX index, which in turn are derived from the VIX index, which in turn is derived from an indexed calculation of the volatility of the market as a whole, which in turn is derived from the action of individual equities in the market.

39.     The complexity of VXX is highlighted in Barclays' VXX Pricing Supplement, in which it describes how the VIX index (just one of the derivatives that goes into the VXX price) is calculated:

On any S&P 500 VIX Futures Business Day, $t$, each Index is calculated as follows:

$$IndexTR_t = IndexTR_{t-1} * (1 + CDR_t + TBR_t)$$

where:

$IndexTR_{t-1}$ = The Index TR on the preceding business day, defined as any date on which the Index is calculated.

$CDR_t$ = Contract Daily Return, as determined by the following formula:

$$CDR_t = \frac{TDWO_t}{TDWI_{t-1}} - 1$$

where:

$_{t-1}$ = the preceding business day.

$TWDO_t$ Total Dollar Weight Obtained on $t$, as determined by the following formula for each of the indices:

$$TWDO_t = \sum_{i=m}^{n} CRW_{i,t-1} * DCRP_{i,t}$$

$TWDI_{t-1}$ Total Dollar Weight Obtained on $t-1$, as determined by the following formula for each of the indices:

$$TWDI_{t-1} = \sum_{i=m}^{n} CRW_{i,t-1} * DCRP_{i,t-1}$$

where:

$CRW_{i,t}$ = Contract Roll Weight of the $i^{th}$ VIX Futures Contract on date $t$.

$DCRP_{i,t}$ = Daily Contract Reference Price of the $i^{th}$ VIX Futures Contract on date $t$.

$m$ = For the S&P 500 VIX Short-Term Futures™ Index m=1. For the S&P 500 VIX Mid-Term Futures™ Index m=4.

$n$ = For the S&P 500 VIX Short-Term Futures™ Index n=2. For the S&P 500 VIX Mid-Term Futures™ Index n=7.

$TBR_t$ = Treasury Bill Return, as determined by the following formula:

$$TBR_t = \left[ \frac{1}{1 - \frac{91}{360} * TBAR_{t-1}} \right]^{\frac{Delta_t}{91}} - 1$$

where:

$Delta_t$ = the number of calendar days between the current and previous business days.

$TBAR_{t-1}$ = the most recent weekly high discount rate for 91-day US Treasury bills effective on the preceding business day. Generally the rates are announced by the US Treasury on each Monday. On Mondays that are bank holidays, Friday's rates will apply. The Bloomberg ticker is USB3MTA.

40.     The structure of the VXX means that fluctuations in the broader securities market have a disproportionately large impact on the VXX. Because the VXX, like all ETNs, is securitized and traded on an exchange, the price of VXX notes move on a continuous basis in response to changes in market conditions.

41.     Attached as Exhibit 1 is a four-page VXX "Snapshot" from Barclays, VXX's creator and issuer. The very first paragraph emphasizes just how risky VXX is, especially for retail investors such as Plaintiff and the putative Class, disclosing that VXX is "riskier than ordinary

unsecured debt securities," has "no principal protection," "involves significant risks, including possible loss of principal," and "may not be suitable for all investors."

42.     Worse yet, the VXX "Historical Performance" chart in the Snapshot, copied in Paragraph Six above, clearly demonstrates that VXX is all but guaranteed to lose value if held for longer than a few days. During the time period in that chart, the VXX lost virtually all of its value, while the S&P 500 increased by more than 300%.

43.     Barclays also publishes a VXX Prospectus, which, along with its accompanying Supplements, is a 270-page document containing 38 pages of "Risk Factors." This includes 95 separately enumerated risk factors in the "Prospectus Supplement" portion of the document. Very few investments require this much risk disclosure, again underscoring the complexity and riskiness of VXX.

44.     One of the risk factors in the VXX "Pricing Supplement" bluntly warns that "over the longer term … the value of futures contracts on the VIX Index will likely decrease … and the potential upside of your investment in your ETNs will correspondingly be limited as a result."

45.     Another risk factor disclosed by Barclays is that because Barclays charges nearly 1% annual VXX fees and commissions, "[t]he estimated value of your securities is expected to be lower than the initial issue price of your securities." Thus, factoring in the 1-1.5% asset management fee charged by Butler, VXX would need to increase in value by over 2% per year to result in any gain for Butler's customers.

46.     Barclays also warns that "[m]ovements in the level, value or price of a reference asset or its components are unpredictable and volatile, and are influenced by complex and interrelated political, economic, financial, regulatory, geographic, judicial and other factors."

47.     A recent New York Times article described VXX as follows:

  a.  "VXX, has since its inception averaged a yearly negative return of negative 58 percent;"

  b.  It is a given that VXX "will decline in value over time;" and

  c.  A financial professor from Vanderbilt University who is considered the "father of the VIX" stated that VXX and similar investments are "incredible complex products … and my concern is that investors don't understand what they are and how their prices behave."

48.  FINRA (the Financial Industry Regulatory Authority) has also disciplined numerous brokers and brokerage firms, such as Fortune, Concorde, TD Ameritrade, and Butler, for selling VXX to retail customers, such as Plaintiff and the putative Class. In FINRA Disciplinary Decision No. 2013-039125501, for example, FINRA described VXX as "rarely if ever suitable as a long-term holding," "generally held for brief periods measured in days rather than months or even weeks," and "a complicated and risky investment which is not suitable for unsophisticated investors." In that case, FINRA found that a broker violated the FINRA rule requiring brokers to only recommend suitable investments. In language directly applicable to this case, FINRA wrote:

> [Broker]'s recommendations to these customers were unsuitable. His customers did not understand the nature and risks of the VXX, and it was not reasonable to expect VXX shares to increase in value, or even retain their value, over the extended periods through which [Broker]'s customers held them. It likewise was not reasonable to expect VXX shares to serve as an effective hedge against a potential market downturn anticipated from the "fiscal cliff" or other potential future events the timing of which was either unpredictable or known to be at least several months away.

## III.  Butler did not understand VXX.

49.  Even though Butler used VXX as a long-term investment, he subsequently testified under oath that "VXXs are short term holds. … You don't plan on holding it long-term." His reasoning for this was "[b]ecause volatility is short-term."

13

50.     In a related FINRA arbitration, Butler also testified under oath the he did not believe VXX could be held for months.

51.     Butler also stated under oath during a deposition that his understanding was that by purchasing VXX, "[y]ou're hedging the market."

52.     Butler further described this strategy as a glorified form of gambling: "You're basically determining if the market has volatility or doesn't have volatility. And the VXX is an investment tool used to bet if there's going to be volatility or there's not going to be volatility within a market."

53.     Butler proceeded to testify that when you "lose" the bet (that is, when you buy VXX, but there is no volatility in the market), you would either sell it and "you would accept your loss or you would hold it until the volatility came back and the price of the VXX would come back."

54.     For VXX to work as Butler believed it would, there would need to be an assurance that the price of VXX would come back. History has shown that such an assurance is impossible.

55.     For example, Butler admitted that for the shares he bought in October 2014 and held for two-and-a-half months, he did not sell them immediately "because the value of the VXX went down." Butler proceeded to admit that he did not know if the value of VXX would come back up.

### IV.     Butler sold VXX to Plaintiff and the putative Class as a medium-to-long-term investment, holding it for months at a time.

56.     Plaintiff, like most (if not all) members of the putative Class, had never heard of VXX prior to meeting Butler. Plaintiff and the putative Class relied on Butler, their advisor who had full discretion over their accounts, to purchase and sell all of the investments in their accounts.

57.     In September 2014, Butler began purchasing interests in the unsecured VXX note on behalf of his clients. Butler was apparently of the opinion that the market was due for a correction, and accordingly, he believed that purchasing VXX shares for retail investors was an appropriate way to hedge against the anticipated market downturn.

58.     During a related FINRA arbitration, Butler testified that he recommended VXX to Plaintiff and the putative Class because *they all* had concerns about market volatility. That is not true. Butler never discussed VXX or market volatility with Plaintiff. In addition, Butler also admitted that his customers did not first come to him with concerns about market volatility, but that he planted the concerns in their minds.

59.     Butler also purchased and sold VXX in his own personal account, and in accounts of family members, including his wife, Heidi.

60.     Throughout fall 2014 and, with more frequency, into January and February of 2015, Butler executed numerous frequent trades of VXX on behalf of Plaintiff and the putative Class. Butler typically executed trades on behalf of 25 or more client accounts at a single time, and held onto the shares of VXX for anywhere from a day to a week. During this time, Butler never discussed VXX with Plaintiff. All of these trades were unsuitable for Plaintiff and the putative Class as unsophisticated retail investors, and never should have been made.

61.     Butler also utilized VXX as a long-term investment vehicle for Plaintiff and the putative Class. For example, on or about October 23, 2014, Butler made several dozen purchases of VXX to his clients' accounts, totaling over 30,000 shares. He held the vast majority of these shares for two and-a-half months – not selling them until on or about January 6, 2015. Butler did not discuss with Plaintiff his strategy of using VXX as a long-term investment.

62.     Butler's buy-and-hold strategy grew much worse in early 2015. On or about February 10, 12, and 13, 2015, Butler made dozens of purchases of VXX to the accounts of Plaintiff and the putative Class, totaling over 60,000 shares and approximately $2 million. These shares sat in his clients' accounts until he began selling some of them in late July 2015 – over 5 months later. Predictably, this reckless long-term buy-and-hold approach led to massive losses for Plaintiff and the putative Class.

### V.     Butler also failed to create individualized, diversified, properly weighted accounts for Plaintiff and the putative Class.

63.     VXX was not the only security that Butler purchased in mass on behalf of Plaintiff and the putative Class.

64.     Butler, exercising his discretion, also made block trades for his clients, including Plaintiff and the putative Class, of several other unsuitable investments, mostly focused in the energy, transportation, and telecommunications fields.

65.     These block investments included:

a.     Purchases on or about October 10, 2014, of Teekay Partners, a ship builder for oil and gas drilling and shipping;

b.     Purchases on or about February 3, 2015, of Seadrill, an offshore oil drilling company; and

c.     Purchases on or about May 13, 2015, of: (i) TAL International, a freight and maritime shipping equipment company; (ii) Alliance Resources, a coal company; (iii) Compass Diversified, a middle-market holding company; and (iv) PDL Biopharma, a biotechnology and pharmaceutical company.

66.     Similar to VXX, the disclosures for these investments contained pages of risk factors which clearly indicate that they are not suitable for most retail investors, such as Plaintiff and the putative Class – and certainly not for upwards of 40 of Butler's customers simultaneously.

67.     Also similar to VXX, Butler did not discuss these investments with Plaintiff.

68.     Not only did Butler's block purchases of these securities fail to create customized, individual investment portfolios for each customer, as bargained for, but it also led to Plaintiff's and the putative Class' portfolios to be neither properly diversified nor balanced.

69.     For example, as of May 2015, Plaintiff's IRA account had a total equity value of approximately $167,000. Roughly $57,000 – approximately one-third of her account – was invested in the incredible risky and volatile VXX. Another $83,500 – half her account – was collectively invested in the six block-purchase securities described above: Teekay Partners, Seadrill, TAL International, Alliance Resources, Compass Diversified, and PDL Biopharma. Thus, nearly 85% of her retirement account was invested in a total of only seven individual securities, most of which were in the same limited sectors and most of which carried an unacceptably high level of risk.

## VI.     Defendants failed in their duty to supervise Butler's investment advisory activities.

70.     Defendants Concorde, Fortune, and Ameritrade all had responsibility to supervise Butler's investment advisory activities, and Defendants all failed in those duties.

71.     Concorde and Fortune, as broker-dealers with whom Butler was registered as an associated person, were required to supervise Butler's investment advisory activities (the trades which form the basis of this Complaint) as if they "were executed on behalf of [Concorde or Fortune]". FINRA Rule 3280(c)(2); *see also* NASD Notice to Members ("NTM") 91-32, NASD

NTM 94-44, and NASD NTM 01-79. Concorde's own supervisory policy manual recognized this same obligation, as have numerous FINRA and NASD disciplinary decisions, as well as federal court decisions. *See Milliner v. Mut. Sec., Inc.*, 207 F. Supp. 3d 1060, 1068 (N.D. Cal. 2016).

72.     Had Concorde and Fortune properly supervised Butler's investment advisory activities, they would have become aware of the following violations of applicable FINRA Rules by both Butler and themselves:

a.      FINRA Rule 2010, requiring that a broker-dealer "observe high standards of commercial honor and just and equitable principles of trade;"

b.      FINRA Rule 2020, prohibiting use of manipulative, deceptive, or other fraudulent devices;

c.      FINRA Rule 2090, requiring broker-dealers to use reasonable diligence in opening and maintaining every account, to know and retain the essential facts concerning every customer to effectively service customer accounts, to act in accordance with any special handling instructions, to understand the authority of each person acting on behalf of customers, and to comply with applicable laws, regulations, and rules;

d.      FINRA Rule 2111, requiring that a broker dealer or associated person "have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of the [firm] or associated person to ascertain the customer's investment profile;"

e.      FINRA Rule 2210, requiring communications with the public to, among other things, be fair and balanced, include material information, and be free from exaggerated, false, or misleading statements or claims;

    f.      FINRA Rule 2370, requiring heightened account opening and suitability obligations regarding securities futures;

    g.      FINRA Rule 2510, imposing heightened duties on managing and supervising any discretionary accounts;

    h.      FINRA Rule 3110, requiring supervisory systems to be "reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable FINRA rules;" and

    i.      FINRA Rule 3280(c), requiring broker dealers such as Concorde and Fortune to supervise approved "private securities transactions," such as Butler's sales of VXX to Plaintiff and the putative Class, as if the transactions occurred at the broker dealer.

73.    Concorde and Fortune also should have put Butler on heightened supervision due to: (a) a past customer dispute he had settled less than four years before joining Concorde; and (b) his admission that he engaged in hedging – either shorting investments or using inverse instruments. *See* NASD NTM 97-19 at 159-160.

74.    TD Ameritrade was also required to supervise Butler's investment advisory activities within the accounts of Plaintiff and the putative Class.

75.    First, TD Ameritrade own manual expressly acknowledges that when an Registered Investment Advisor, such as Butler, trades on a customer's behalf using TD Ameritrade's platform, TD Ameritrade owes the customer a fiduciary obligation to ensure that the advisors adhere to the FINRA regulatory standards.

76.    Second, as the "e-broker" that effectuated the trades, TD Ameritrade was required to comply with the FINRA Rules listed above, such as Rule 2090 ("know your customer"), Rule 2111 (suitability), and Rule 3110 (supervision). TD Ameritrade failed to comply with these rules.

77.     Wisconsin River Bank also had a duty to perform due diligence before recommending Butler to its customers, and ensure that Butler's investment advisory services complied with the applicable securities laws, rules, and regulations.

78.     Finally, because Butler was acting as the agent or employee of each of the Defendants, they are all vicariously liable for Butler's actions under the theory of apparent authority:

a.     Fortune and Concorde actively ensured that Butler held himself out to the world as their agent. They also made no effort to alert Butler's customers of the differences between the broker-dealers (Fortune and Concorde) and the Registered Investment Advisor (Wisconsin Investment Services). Many members of the putative Class, including Plaintiff, also maintained accounts with Butler at Fortune or Concorde, further blurring the differences. As a result, Plaintiff and the putative Class could not be reasonably expect to differentiate between Butler's investment advisory business and his registered representative business.

b.     Ameritrade maintained the accounts of Plaintiff and the putative Class, executed and effected all transactions for Plaintiff and the putative Class, and sent monthly account statements to Plaintiffs and the putative Class. All of this was done on Butler's behalf, and Butler was able to use the Ameritrade platform to manage Plaintiff's and the putative Class' accounts. Accordingly, it was reasonable for Plaintiffs and the putative Class to assume that Butler was Ameritrade's agent, and Ameritrade had acquiesced in the management of the accounts under Butler's control.

c.     Wisconsin River Bank referred its clients and customers to Butler. Upon information and belief, Butler also met with clients at Wisconsin River Bank. As such,

those members of the putative Wisconsin River Bank Sub-Class, who were referred to Butler by the Bank, could reasonably assume that Butler was acting as Wisconsin River Bank's agent in providing investment advisory services.

**VII.   Plaintiff and the putative Class suffered excessive losses as a result of Defendants' wrongful conduct.**

79.     Plaintiff and the putative Class suffered massive losses due to Butler's reckless "buy-and-hold" strategy with VXX.

80.     For example, in transactions on February 10, 12, and 13, 2015, Butler purchased 3,000 shares of VXX in Plaintiff's account. The total cost of the 3,000 shares was $97,047.69.

81.     Butler proceeded to let the 3,000 shares of VXX sit in Plaintiff's account for five and a half months, not selling them until July 24, 2015. Butler then sold all 3,000 shares of VXX from Plaintiff's account in a single transaction for $50,422.08.

82.     Plaintiff suffered a loss of $46,625.61 in that single transaction – nearly 50% of the initial investment value for those shares of VXX.

83.     Plaintiff's losses from Butler's VXX "buy-and-hold" strategy could have easily been avoided. Indeed, had any of the Defendants properly supervised Butler's management of Plaintiff's account, or investigated Butler's investment advisory activity, the losses would have been greatly mitigated, if not avoided all together.

84.     Plaintiff and the putative Class also lost significant amounts of money as a result of Butler's reckless strategy of executing block trades on behalf of dozens of his clients in the same six securities, leading to non-individualized, non-diversified, heavily skewed accounts.

85.     For instance, Butler purchased 500 shares of TAL International in Plaintiff's account on May 13, 2015, at a total cost of $18,686.19. Upon information and belief, Butler

executed purchases of TAL International in at least 17 client accounts, including 12 members of the putative Class, within a matter of minutes of that day. Butler then liquidated Plaintiff's shares of TAL on August 5, 2015, for a total price of $10,516.36. Even factoring in the $360 in dividends that Plaintiff received, her losses in TAL International were over 40%.

86.     Plaintiff's losses from Butler's block trades of undiversified, speculative securities could also have been easily avoided. Indeed, had any of the Defendants properly supervised Butler's management of Plaintiff's account, or investigated Butler's investment advisory activity, the losses would have been greatly mitigated, if not avoided all together.

87.     However, none of the Defendants properly supervised or investigated Butler's actions or Plaintiff and the putative Class' accounts, and as a result, they suffered massive losses.

## Class Action Allegations

88.     This action is brought and may properly be maintained as a Class Action, as it satisfies the requirements of Wisconsin Statute Section 803.08. Plaintiff seeks to have the following Class and Sub-Classes certified:

a.     **Putative Class:**   All individuals who: (1) Were retail clients of Jeffrey Butler and Wisconsin Investment Services while Jeffrey Butler was registered with Concorde or Fortune; (2) Maintained accounts at TD Ameritrade, which Butler had discretion to manage; (3) Purchased VXX through Butler and TD Ameritrade on or about February 10, 12, or 13, 2015; and (4) Held those shares of VXX for four months or more.

b.     **Wisconsin River Bank Sub-Class:**   All individuals who: (1) Are members of the putative Class; and (2) Were referred to Butler through or by Wisconsin River Bank.

c.     **Block Trades Sub-Class:**   All individuals who: (1) Are members of the putative Class; and (2) Through Butler and TD Ameritrade, purchased Teekay Partners on

or about October 10, 2014; Seadrill on or about February 3, 2015; or TAL International, Alliance Resources, Compass Diversified, or PDL Biopharma on or about May 13, 2015.

89.    Excluded from the putative Class is: (a) each Defendant; (b) any affiliate, parent, subsidiary, or immediate family member of any Defendant; (c) any entity in which any Defendant has a controlling interest; (d) any officer, director, or employee of any Defendant; (e) any successor or assign of any Defendant; (f) anyone employed by counsel in this action; (g) any judge to whom this case is assigned, her or his spouse, and immediate family members; (h) members of the judge's staff; and (i) any individuals or entities who otherwise would be a member of the putative Class but have already brought an arbitration or lawsuit based on the same set of facts as this lawsuit and have settled or resolved their claims.

90.    Class Period: The "Class Period" is the is the period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling and accrual issues, and ending on the date of entry of judgment.

91.    Numerosity: While the exact number of putative Class members cannot be determined yet, upon information and belief, the putative Class consists of at least 35, but no more than 49 members. The members of the putative Class are therefore so numerous that joinder of all members is impracticable. The exact number and identification of putative Class and Sub-Class members can readily be determined by review of information required to be maintained by Defendants.

92.    Commonality: Common questions of law and fact exist as to all members of the putative Class and Sub-Classes. Among the questions of law and fact common or general to the putative Class and putative Sub-Classes are:

a.    Whether VXX is suitable for Plaintiff and the putative Class;

23

b.      Whether Butler sold VXX to Plaintiff and the putative Class on or about February 10, 12, or 13, 2015;

c.      Whether Plaintiff and the putative Class held those shares of VXX in their accounts for four months or more;

d.      Whether TD Ameritrade executed the sales of VXX on behalf of Plaintiff and the putative Class;

e.      Whether Butler failed to communicate material information to Plaintiff and the putative Class regarding the purchase of VXX;

f.      Whether Concorde, Fortune, TD Ameritrade, Butler, and Wisconsin Investment Services failed to communicate material information to Plaintiff and the putative Class regarding VXX;

g.      Whether Butler's sale of VXX to Plaintiff and the putative Class violated the Wealth Management Agreement with each of them;

h.      Whether Butler's sale of VXX to Plaintiff and the putative Class violated FINRA rules;

i.      Whether Concorde, Fortune, TD Ameritrade, and Wisconsin Investment Services properly supervised Butler's investment advisory activities, including the sales of VXX to Plaintiff and the putative Class;

j.      Whether Butler's sales of VXX damaged and caused injury to Plaintiff and the putative Class;

k.      Whether Butler sold Teekay Partners, Seadrill, Alliance Resource, Compass Diversified, PDL Biopharma, and TAL International to Plaintiff and the putative Block Trades Sub-Class on the alleged dates;

24

l.      Whether TD Ameritrade executed the sales of the aforementioned securities on behalf of Plaintiff and the putative Block Trades Sub-Class;

m.      Whether Butler's sale of the aforementioned securities to Plaintiff and the putative Block Trades Sub-Class was suitable, negligent, fraudulent, and/or a violation of the Wealth Management Agreement;

n.      Whether Butler's sale of the aforementioned securities injured Plaintiff and the putative Block Trades Sub-Class;

o.      Whether Concorde, Fortune, TD Ameritrade, and Wisconsin Investment Services properly supervised Butler's sale of the aforementioned securities to Plaintiff and the putative Block Trades Sub-Class;

p.      Whether Wisconsin River Bank introduced or referred the members of the putative Wisconsin River Bank Sub-Class to Butler;

q.      Whether Wisconsin River Bank properly investigated Butler and Wisconsin Investment Services prior to recommending them to the members of the putative Wisconsin River Bank Sub-Class;

r.      Whether Fortune, Concorde, TD Ameritrade, and Wisconsin River Bank are liable for the acts of their agent, Butler, for breaching his contracts with investment advisory clients;

s.      Whether Fortune, Concorde, TD Ameritrade, and Wisconsin River Bank are liable for the acts of their agent, Butler, for recommending and selling unsuitable investments;

t.      Whether Fortune, Concorde, TD Ameritrade, and Wisconsin Investment Services had a duty to establish, maintain, and implement a system of controls to identify,

25

monitor, and investigate potentially unsuitable sales of securities to Butler's investment advisory clients;

u.      Whether Fortune, Concorde, TD Ameritrade, and Wisconsin Investment Services established, maintained, and implemented a system of controls to protect Plaintiff and the putative Class by identifying and investigating potentially unsuitable sales of securities to their agents' investment advisory clients;

v.      Whether Fortune, Concorde, TD Ameritrade, and Wisconsin Investment Services had a duty to establish adequate formal training regarding ETNs to satisfy its reasonable basis suitability obligation before selling those investments to any investors;

w.      Whether Fortune, Concorde, TD Ameritrade, and Wisconsin Investment Services established adequate formal training regarding ETNs;

x.      Whether Concorde is liable for damages and the amount of such damages;

y.      Whether Fortune is liable for damages and the amount of such damages;

z.      Whether TD Ameritrade is liable for damages and the amount of such damages;

aa.     Whether Wisconsin River Bank is liable for damages and the amount of such damages;

bb.     Whether Jeffrey Butler is liable for damages and the amount of such damages; and

cc.     Whether Wisconsin Investment Services is liable for damages and the amount of such damages.

93.     Typicality: Plaintiff Susan Nielen-Thomas has substantially the same interests in this matter as all other members of the putative Class and Sub-Classes, her claims arise out of the

same set of facts and conduct as all other members of the putative Class and Sub-Classes, and

Plaintiff has sustained damages arising out of Defendants' course of conduct and was damaged in

materially the same way by Defendants' conduct.

94.     Adequacy of Representation: Plaintiff is committed to pursuing this action and has

retained competent counsel experienced in Class Actions, complex litigation, and securities

litigation. Accordingly, Plaintiff will fairly and adequately protect the interests of the members of

the putative Class and Sub-Classes. Plaintiff's claims are coincident with, and not antagonistic to,

those of the other putative Class and Sub-Class members she seeks to represent. Plaintiff has no

disabling conflicts with the members of the putative Class and will fairly and adequately represent

the interests of the putative Class and Sub-Class members.

95.     The common questions of law and fact enumerated above predominate over the

questions affecting only individual members of the putative Class and Sub-Classes, and a Class

Action is the superior method for fair and efficient adjudication of the controversy. Plaintiff's

counsel foresee little difficulty in the management of this case as a Class Action.

## Claims for Relief

### First Cause of Action: Violation of Wisconsin Uniform Securities Act
*On behalf of the putative Class and putative Block Trades Sub-Class;*
*Against Defendants Concorde, Fortune, Wisconsin River Bank, Butler, and Wisconsin*
*Investment Services*

96.     Plaintiff incorporates by reference all prior allegations as if set forth herein.

97.     It is unlawful for any person or entity, in connection with an offer for sale of a

security, to "make any untrue statement of a material fact," "omit to state a material fact" that is

necessary in order to make the statements made not misleading, or to "engage in an act, practice,

or course of business that operates … as a fraud or deceit upon another person." Wis. Stat. §
551.501(2) and (3).

98.     Violations of this standard are the grounds for a civil action to recover the value of
the security, less any income received, plus 5% interest and attorney fees. Wis. Stat. § 551.509.
Pursuant to a longstanding decision of the Wisconsin Court of Appeals, recovery under Section
551.501 does not require any assertion, evidence, or proof of *intent* to defraud. *State v. Temby*, 108
Wis. 2d 521, 322 N.W.2d 522 (Ct. App. 1982); *accord*, *State v. Mueller*, 201 Wis. 2d 121, 137-
39, 549 N.W.2d 455 (Ct. App. 1996). All that is required is that a broker fail to disclose a material
fact or misrepresent a material fact of an investment he or she was recommending, or engage in an
act or course of business that operates as a fraud or deceit on another.

99.     By recommending and purchasing the investments for the accounts of Plaintiff, the
putative Class, and the putative Block Trades Sub-Class, Butler made an implicit representation
that the investments and investment strategy were suitable for Plaintiff, the putative Class, and the
putative Block Trades Sub-Class.

100.    Butler failed to disclose material facts that were necessary to make the
representations that were made not misleading.

101.    By purchasing unsuitable investments for Plaintiff, the putative Class, and the
putative Block Trades Sub-Class without their knowledge or approval, Butler engaged in an act,
practice, and course of action that operated as a fraud and deceit upon Plaintiff, the putative Class,
and the putative Block Trades Sub-Class.

102.    Butler and Wisconsin Investment Services are directly liable for this violation of
the Wisconsin Uniform Securities Act.

103.   Fortune and Concorde are also directly liable for this violation of the Wisconsin Uniform Securities Act, as they were responsible for supervising Butler's activities as if they were occurring within their own firm.

104.   Fortune, Concorde, Wisconsin River Bank, and Wisconsin Investment Services are vicariously liable for this violation of the Wisconsin Uniform Securities Act pursuant to the doctrine of apparent authority.

105.   As a result of Defendants' violations of Wisconsin's Uniform Securities Law, Plaintiff, the putative Class, and the putative Block Trades Sub-Class were damaged in an amount to be determined at trial.

### Second Cause of Action: Violation of Nebraska Securities Act
*On behalf of the putative Class and putative Block Trades Sub-Class;*
*Against Defendant TD Ameritrade*

106.   Plaintiff incorporates by reference all prior allegations as if set forth herein.

107.   TD Ameritrade's "Client Agreement" provides that disputes are to be governed by the laws of TD Ameritrade's home state, Nebraska.

108.   It is unlawful under Nebraska law for any person to offer of sell a security "by means of any untrue statement of a material fact" or by "any omission to state a material fact necessary in order to make the statements made in the light of the circumstances under which they are made not misleading," provided that "the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he or she did not know and in the exercise of reasonable care could not have known of the untruth or omission." Neb. Rev. Stat. § 8-1118(1).

109.   By recommending and purchasing the investments for the accounts of Plaintiff, the putative Class, and the putative Block Trades Sub-Class, Butler made an implicit representation

that the investments and investment strategy were suitable for Plaintiff, the putative Class, and the putative Block Trades Sub-Class.

110.    Butler failed to disclose material facts that were necessary to make the representations that were made not misleading.

111.    Plaintiff, the putative Class, and the putative Block Trades Sub-Class did not know of the truth or omission, and in the exercise of reasonable care, could not have known.

112.    By purchasing unsuitable investments for Plaintiff, the putative Class, and the putative Block Trades Sub-Class without their knowledge or approval, Butler violated Nebraska Revised Statute Section 8-1118(1).

113.    TD Ameritrade is vicariously liable for this violation of the Nebraska Securities Act pursuant to the doctrine of apparent authority.

114.    Violations of this standard are the grounds for a civil action to recover the value of the security, less any income received, plus 6% interest, costs, and reasonable attorney fees. Neb. Rev. Stat. § 8-1118(1).

115.    As a result of Defendants' violations of the Nebraska Securities Act, Plaintiff, the putative Class, and the putative Block Trades Sub-Class were damaged in an amount to be determined at trial.

### Third Cause of Action: Violation of Wisconsin Statute Section 100.18
*On behalf of the putative Class and putative Block Trades Sub-Class;*
*Against Defendants Concorde, Fortune, Wisconsin River Bank, Butler, and Wisconsin Investment Services*

116.    Plaintiff incorporates by reference all prior allegations as if set forth herein.

117.    Wisconsin Statute Section 100.18, "Fraudulent Representations," prohibits any person, corporation, or agent or employee thereof, with intent to sell any item, to make any

representation or statement of fact in any advertisement or solicitation that is untrue, deceptive, or misleading.

118.    Butler made material misrepresentations in the sale of securities to Plaintiff, the putative Class, and the putative Block Trades Sub-Class about the suitability and safety of the investments and the investment strategy.

119.    Butler and Wisconsin Investment Services are directly liable for this violation of Wisconsin Statute Section 100.18.

120.    Fortune and Concorde are also directly liable for this violation of Wisconsin Statute Section 100.18, as they were responsible for supervising Butler's activities as if they were occurring within their own firm.

121.    Fortune, Concorde, Wisconsin River Bank, and Wisconsin Investment Services are vicariously liable for this violation of Wisconsin Statute Section 100.18 pursuant to the doctrine of apparent authority.

122.    Wisconsin Statute Section 100.18(11)(b) entitles any person suffering any pecuniary loss because of a violation of the statute to recover the amount of their loss plus reasonable attorneys' fees.

123.    Defendants' violations of Section 100.18 damaged Plaintiff, the putative Class, and the putative Block Trades Sub-Class in an amount to be determined at trial.

**Fourth Cause of Action: Breach of Contract**
*On behalf of the putative Class and putative Block Trades Sub-Class;*
*Against Defendant TD Ameritrade under the common law of Nebraska;*
*Against Defendants Concorde, Fortune, Wisconsin River Bank, Butler, and Wisconsin*
*Investment Services under the common law of Wisconsin*

124.    Plaintiff incorporates by reference all prior allegations as if set forth herein.

31

125.    Butler breached the "Wealth Management Agreement" contract with Plaintiff, the putative Class, and the putative Block Trades Sub-Class by: (a) failing to create custom portfolios around each clients' financial needs, goals, and financial situation; (b) investing in securities that were not specified in Wisconsin Investment Services' ADVII; (c) not making decisions for Plaintiff, the putative Class, and the putative Block Trades Sub-Class in good faith; (d) failing to exercise the skill, prudence, and diligence that a fiduciary would use; (e) engaging in investment strategies that entailed both an extreme amount of significant and unusual risks, and frequent trading; (f) failing to monitor accounts on an ongoing basis; and (h) recommending securities which Butler also bought and sold for himself and his immediate family members.

126.    Butler instead implemented a one-size-fits-all trading strategy in his clients' accounts, making it impossible for Butler to make trades consistent with each client's financial circumstances, risk tolerance, and investment objectives.

127.    Butler's buy-and-hold strategy for VXX was also not in accordance with any of his customers' investment objectives.

128.    Butler also bought and sold VXX in his own personal account and his wife's account.

129.    As a result, Butler breached his contracts with Plaintiff, the putative Class, and the putative Block Trades Sub-Class.

130.    Butler and Wisconsin Investment Services are directly liable for this breach of contract.

131.    Fortune and Concorde are also directly liable for this breach of contract, as they were responsible for supervising Butler's activities as if they were occurring within their own firm.

32

132.    Fortune, Concorde, TD Ameritrade, Wisconsin River Bank, and Wisconsin Investment Services are vicariously liable for this breach of contract pursuant to the doctrine of apparent authority.

133.    TD Ameritrade also breached their Client Agreement contract with Plaintiff and the putative Class by failing to ensure that as a fiduciary, Butler acted in Plaintiff's, the putative Class', and the putative Block Trades Sub-Class' best interests, and placed Plaintiff's, the putative Class', and the putative Block Trades Sub-Class' interests before Butler's own interests.

134.    Plaintiff, the putative Class, and the putative Block Trades Sub-Class were damaged by these breaches of contract in an amount to be determined at trial.

### Fifth Cause of Action: Fraud
*On behalf of the putative Class and putative Block Trades Sub-Class;*
*Against Defendant TD Ameritrade under the common law of Nebraska;*
*Against Defendants Concorde, Fortune, Wisconsin River Bank, Butler, and Wisconsin*
*Investment Services under the common law of Wisconsin*

135.    Plaintiff incorporates by reference all prior allegations as if set forth herein.

136.    Butler made material misrepresentations in the sale of securities to Plaintiff, the putative Class, and the putative Block Trades Sub-Class about the suitability and safety of the investments and the investment strategy.

137.    Butler knew that the representations made were not true or made the representations with reckless disregard as to whether or not they were true.

138.    Butler further omitted to disclose material facts related to the sale of securities to Plaintiff, the putative Class, and the putative Block Trades Sub-Class.

139.    Butler made the misrepresentations and omissions of material facts with the intent to defraud Plaintiff, the putative Class, and the putative Block Trades Sub-Class through their reliance on the misrepresentations and omissions.

33

140.    Plaintiff, the putative Class, and the putative Block Trades Sub-Class relied on those misrepresentations and omissions, and suffered damages as a result.

141.    Butler and Wisconsin Investment Services are directly liable for the misrepresentations and omissions.

142.    Fortune and Concorde are also directly liable for the misrepresentations and omissions, as they were responsible for supervising Butler's activities as if they were occurring within their own firm.

143.    Fortune, Concorde, TD Ameritrade, Wisconsin River Bank, and Wisconsin Investment Services are vicariously liable for the misrepresentations and omissions pursuant to the doctrine of apparent authority.

144.    Plaintiff, the putative Class, and the putative Block Trades Sub-Class were damaged by those misrepresentations and omissions in an amount to be determined at trial, including punitive damages.

## Sixth Cause of Action: Negligence
*On behalf of the putative Class and putative Block Trades Sub-Class;*
*Against Defendant TD Ameritrade under the common law of Nebraska;*
*Against Defendants Concorde, Fortune, Wisconsin River Bank, Butler, and Wisconsin Investment Services under the common law of Wisconsin*

145.    Plaintiff incorporates by reference all prior allegations as if set forth herein.

146.    TD Ameritrade, Butler, and Wisconsin Investment Services owed a duty of care to their customers and account holders, including Plaintiff, the putative Class, and the putative Block Trades Sub-Class.

147.    Those duties included only making suitable recommendations of securities to Plaintiff, the putative Class, and the putative Block Trades Sub-Class.

34

148.    Those duties required Defendants to consider important factors such as Plaintiff, the putative Class, and the putative Block Trades Sub-Class' ages, life stages, and particular circumstances when analyzing which investments would be suitable for Plaintiff, the putative Class, and the putative Block Trades Sub-Class.

149.    TD Ameritrade, Butler, and Wisconsin Investment Services purchased unsuitable investments for Plaintiff, the putative Class, and the putative Block Trades Sub-Class, such as VXX, which was highly risky, especially when held for more than a few days at a time.

150.    TD Ameritrade, Butler, and Wisconsin Investment Services also made unsuitable block purchases of investments for Plaintiff and the putative Block Trades Sub-Class, such as TAL International or Seadrill, which resulted in heavily imbalanced and non-diversified accounts.

151.    TD Ameritrade, Butler, and Wisconsin Investment Services often purchased these unsuitable investments on behalf of Plaintiff, the putative Class, and the putative Block Trades Sub-Class without their knowledge or approval.

152.    TD Ameritrade, Butler, and Wisconsin Investment Services breached their duty of care to Plaintiff, the putative Class, and the putative Block Trades Sub-Class in purchasing these unsuitable investments, or in allowing them to be purchased.

153.    Fortune and Concorde are also directly liable for this negligence, as they were responsible for supervising Butler's activities as if they were occurring within their own firm.

154.    Fortune, Concorde, TD Ameritrade, Wisconsin River Bank, and Wisconsin Investment Services are vicariously liable for this negligence pursuant to the doctrine of apparent authority.

155.    Absent Defendants' acts and omissions, Plaintiff, the putative Class, and the putative Block Trades Sub-Class would not have purchased these unsuitable investments.

156.    As a result, Plaintiff, the putative Class, and the putative Block Trades Sub-Class was damaged in an amount to be determined at trial.

## Seventh Cause of Action: Negligence
*On behalf of the putative Wisconsin River Bank Sub-Class;*
*Against Defendant Wisconsin River Bank under the common law of Wisconsin*

157.    Plaintiff incorporates by reference all prior allegations as if set forth herein.

158.    Wisconsin River Bank owed a duty of care to their customers and account holders, including the putative Wisconsin River Bank Sub-Class.

159.    Those duties included only making suitable recommendations of investment advisors to the putative Wisconsin River Bank Sub-Class.

160.    By recommending Butler to the putative Wisconsin River Bank Sub-Class, Wisconsin River Bank breached its duties.

161.    As a result, the putative Wisconsin River Bank Sub-Class was damaged in an amount to be determined at trial.

## Eighth Cause of Action: Negligence – Failure to Supervise
*On behalf of the putative Class and putative Block Trades Sub-Class;*
*Against Defendant TD Ameritrade under the common law of Nebraska;*
*Against Defendants Concorde and Fortune under the common law of Wisconsin*

162.    Plaintiff incorporates by reference all prior allegations as if set forth herein.

163.    Defendants TD Ameritrade, Concorde, and Fortune owed a duty of care to Plaintiff, the putative Class, and the putative Block Trades Sub-Class.

164.    FINRA Rule 3110(a) requires each FINRA member to "establish and maintain a system to supervise the activities of each registered representative… that is reasonably designed to achieve compliance with applicable securities laws and regulations, and applicable NASD rules."

165.   FINRA Rule 2510 ("Discretionary Accounts") further imposes a duty on all FINRA Members, including Ameritrade, who effect trades in a discretionary account to refrain from "excessive size or frequency [of trading] in view of the financial resources and character of such account." The rule also imposes the duty to record each discretionary order and "review all discretionary accounts at frequent intervals in order to detect and prevent transactions which are excessive in size or frequency in view of the financial resources and character of the account."

166.   FINRA Rule 3280 required Fortune and Concorde to supervise Butler's investment advisory transactions as if there were taking place at Fortune and Concorde.

167.   Thus, TD Ameritrade, Concorde, and Fortune were under a duty to supervise the sale of all securities by their registered representatives and advisors, including Butler, making sure that these investments matched the investment objective and risk tolerances of Plaintiff, the putative Class, and the putative Block Trades Sub-Class.

168.   Despite that duty, and the fact that TD Ameritrade even effected the trades, Defendants did nothing to ensure that these investments were of the character and quality which matched Plaintiff's, the putative Class', and the putative Block Trades Sub-Class' investment objectives and risk tolerances.

169.   Plaintiff's, the putative Class', and the putative Block Trades Sub-Class' accounts were aggressively and frequently traded, far in excess of what was warranted for the stated account objectives or financial circumstances.

170.   TD Ameritrade, Concorde, and Fortune breached their duties by, among other things: (1) failing to develop adequate procedures to ensure the suitability of sales of investments to Plaintiff, the putative Class, and the putative Block Trades Sub-Class; (2) failing to ensure and have systems in place to determine that the investments sold to Plaintiff, the putative Class, and

the putative Block Trades Sub-Class were suitable; (3) for Concorde and Fortune, negligently training their registered representative, Butler, about the investments he was selling, as required by FINRA to meet their reasonable-basis suitability obligations; (4) negligently supervising Butler's sales of unsuitable investments to Plaintiff, the putative Class, and the putative Block Trades Sub-Class; and (5) failing to thoroughly investigate evidence in their possession that Plaintiff, the putative Class, and the putative Block Trades Sub-Class had been sold and/or continued to hold unsuitable securities.

171.    TD Ameritrade's, Concorde's, and Fortune's acts and omissions injured Plaintiff, the putative Class, and the putative Block Trades Sub-Class. Indeed, but for the acts and omissions of Defendants, Plaintiff, the putative Class, and the putative Block Trades Sub-Class would not have been sold unsuitable investments and suffered substantial losses.

172.    Accordingly, TD Ameritrade, Concorde, and Fortune are liable for damages in an amount to be proved at trial.

### Ninth Cause of Action: Breach of Fiduciary Duty
*On behalf of the putative Class and putative Block Trades Sub-Class;*
*Against Defendant TD Ameritrade under the common law of Nebraska;*
*Against Defendants Concorde, Fortune, Wisconsin River Bank, Butler, and Wisconsin*
*Investment Services under the common law of Wisconsin*

173.    Plaintiff incorporates by reference all prior allegations as if set forth herein.

174.    By agreeing to take on discretionary authority for the accounts of Plaintiff, the putative Class, and the putative Block Trades Sub-Class, Butler owed a fiduciary duty to Plaintiff, the putative Class, and the putative Block Trades Sub-Class.

175.    As TD Ameritrade acknowledges in its internal documents, TD Ameritrade also owed a fiduciary obligation to Plaintiff, the putative Class, and the putative Block Trades Sub-Class.

176.   TD Ameritrade and Butler breached their fiduciary duties to Plaintiff, the putative Class, and the putative Block Trades Sub-Class when they implemented: (a) A "buy-and-hold" VXX investment strategy; and (b) A "one-size-fits-all" trading strategy that resulted in heavily imbalanced, non-diversified accounts.

177.   TD Ameritrade, Butler, and Wisconsin Investment Services are directly liable for this breach of fiduciary duty.

178.   Fortune and Concorde are also directly liable for this breach of fiduciary duty, as they were responsible for supervising Butler's activities as if they were occurring within their own firm.

179.   Fortune, Concorde, TD Ameritrade, Wisconsin River Bank, and Wisconsin Investment Services are vicariously liable for this breach of fiduciary duty pursuant to the doctrine of apparent authority.

180.   TD Ameritrade also breached its fiduciary duties to Plaintiff, the putative Class, and the putative Block Trades Sub-Class when it failed to properly supervise the transactions made by Butler.

181.   Wisconsin River Bank also owed its customers a fiduciary duty when it referred them to outside investment advisors, such as Butler.

182.   Wisconsin River Bank breached this duty by either failing to properly investigate Butler and his risky and speculative investment advisory strategies before recommending him to its customers, or by recommending Butler to its customers in spite of his risky and speculative investment advisory strategies.

183.   Plaintiff, the putative Class, and the putative Block Trades Sub-Class were damaged by these breaches of fiduciary duty in an amount to be determined at trial.

**Tenth Cause of Action: Breach of the Securities Act of 1933**
*On behalf of the putative Class and putative Block Trades Sub-Class;*
*Against Defendants Concorde, Fortune, TD Ameritrade, Wisconsin River Bank, Butler, and*
*Wisconsin Investment Services*

184.    Plaintiff incorporates by reference all prior allegations as if set forth herein.

185.    Section 12(2) of the Securities Act of 1933 makes it illegal for any person to offer or sell a security "by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission." 15 U.S.C. § 77l(a)(2).

186.    Butler offered and sold securities to Plaintiff, the putative Class, and the putative Block-Trades Sub-Class by means and instruments of communication in interstate commerce, as well as by means of a prospectus as defined in the Securities Act of 1933, and by oral communications.

187.    By recommending and purchasing the investments for the accounts of Plaintiff, the putative Class, and the putative Block Trades Sub-Class, Butler made an implicit representation that the investments and investment strategy were suitable for Plaintiff, the putative Class, and the putative Block Trades Sub-Class.

188.    Butler failed to disclose material facts that were necessary to make the representations that were made not misleading.

189.    Plaintiff, the putative Class, and the putative Block Trades Sub-Class did not know of the truth or omission, and in the exercise of reasonable care, could not have known.

190.    By purchasing unsuitable investments for Plaintiff, the putative Class, and the putative Block Trades Sub-Class without their knowledge or approval, Butler violated the Securities Act of 1933.

191.    Violations of the Securities Act of 1933 are the grounds for a civil action "in any court of competent jurisdiction to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon." 15 U.S.C. § 77l(a)(2).

192.    Butler and Wisconsin Investment Services are directly liable for this violation of the Securities Act of 1933.

193.    Fortune and Concorde are also directly liable for this violation of the Securities Act of 1933, as they were responsible for supervising Butler's activities as if they were occurring within their own firm.

194.    TD Ameritrade, Fortune, Concorde, Wisconsin River Bank, and Wisconsin Investment Services are vicariously liable for this violation of the Securities Act of 1933 pursuant to the doctrine of apparent authority.

195.    As a result of Defendants' violations of the Securities Act of 1933, Plaintiff, the putative Class, and the putative Block Trades Sub-Class were damaged in an amount to be determined at trial.

**Demand for Judgment**

**WHEREFORE,** the Plaintiff prays for the following judgment:

A.  An Order certifying this action as a Class Action;

B.  An Order appointing Plaintiff Susan Nielen-Thomas as Class Representative and appointing the undersigned counsel to represent the Class;

C.  Judgment against Defendants in amounts to be determined;

D.  An award of punitive damages in amounts to be determined;

E.  An award of attorneys' fees and costs, as provided by law and/or as would be reasonable from any recovery of monies recovered for or benefits bestowed on the Class;

F.  Interest as provided by law, including but not limited to pre-judgment and post-judgment interest as provided by rule or statute; and

G.  Such other and further relief as this Court may deem just, equitable, or proper.

## Jury Demand

The Plaintiff, on behalf of herself and all other members of the putative Class, demands a trial by jury.

Dated: February 5, 2018

HALLING & CAYO, S.C.
Attorneys for Plaintiff and the putative Class

Electronically Signed By:     /s/ Michael H. Schaalman
MICHAEL H. SCHAALMAN
State Bar No. 1015424
mhs@hallingcayo.com

PATRICK T. O'NEILL
State Bar. No. 1079079
pto@hallingcayo.com

320 E. Buffalo Street, Suite 700
Milwaukee, WI 53202
(414) 271-3400

42

# Exhibit 1







# VXX

## iPath®S&P 500 VIX Short-Term Futures™ ETN

The iPath® S&P 500 VIX Short-Term Futures™ ETNs (the "ETNs") are designed to provide exposure to the S&P 500 VIX Short-Term Futures™ Index Total Return (the "Index"). The ETNs are riskier than ordinary unsecured debt securities and have no principal protection. The ETNs are unsecured debt obligations of the issuer, Barclays Bank PLC, and are not, either directly or indirectly, an obligation of or guaranteed by any third party. Any payment to be made on the ETNs, including any payment at maturity or upon redemption, depends on the ability of Barclays Bank PLC to satisfy its obligations as they come due. An investment in the ETNs involves significant risks, including possible loss of principal and may not be suitable for all investors.

The Index is designed to provide access to equity market volatility through CBOE Volatility Index® (the "VIX Index") futures. The Index offers exposure to a daily rolling long position in the first and second month VIX futures contracts and reflects market participants' views of the future direction of the VIX index at the time of expiration of the VIX futures contracts comprising the Index. Owning the ETNs is not the same as owning interests in the index components included in the Index or a security directly linked to the performance of the Index.For additional information regarding the risks associated with the ETNs, please see "Selected Risk Considerations" below.

## Summary

| | |
|---|---|
| Primary Exchange | NYSE Arca |
| ETN Ticker | VXX |
| Intraday Indicative Value Ticker | VXX.IV[1] |
| Bloomberg ETN Keystroke | VXX<EQUITY><GO> |
| Bloomberg Index Ticker | SPVXSTR |
| Investor Fee Rate | 0.89% per annum[2] |
| CUSIP | 06746L422 |
| ISIN | US06746L4225 |
| Inception Date | 29 January 2009 |
| Maturity | 30 January 2019 |

## Market Indicators (as of 01/31/2018)

| | |
|---|---|
| Closing Indicative Note Value | $29.77 |
| Market Capitalization[3] | $1,015,366,878 |
| ETNs outstanding | 34,107,050 |

The performance quoted represents past performance and does not guarantee future results. Investment return and principal value of an investment will fluctuate so that an investment, when sold or redeemed may be worth more or less than the original cost. Current performance may be lower or higher than the performance quoted. See additional information below for how return figures are calculated. PAST PERFORMANCE IS NOT INDICATIVE OF FUTURE RESULTS

1.  **Intraday Indicative Value.** The "intraday indicative value" meant to approximate the value of the ETNs during the current trading day by reference to the underlying index is calculated and published during the course of each trading day. The intraday indicative value is intended to provide investors with an approximation of the effect that intraday changes in the level of the underlying index would have on the closing indicative value of the ETNs. The intraday indicative value only reflects the accrued investor fee and other applicable costs at the close of business on the preceding day, but does not include any adjustment for the investor fee or applicable costs accruing during the course of the current day. For more information on how the intraday indicative value is calculated, please see the section "Valuation of the ETNs" in the prospectus relating to the ETNs.

The intraday indicative value is provided for reference purposes only. It is not intended as a price or quotation, or as an offer or solicitation for the purchase, sale, redemption or termination of the ETNs, nor does it reflect hedging or transaction costs, credit considerations, market liquidity, or bid-offer spreads. Published index levels from the sponsors of the indices underlying the ETNs may occasionally be subject to delay or postponement. Any such delays or postponements will affect the level of the index and therefore the intraday indicative value of the ETNs. Index levels provided by the sponsors of the indices underlying the ETNs do not necessarily reflect the depth and liquidity of the underlying markets for the index components. For this reason and others, the actual trading price of the ETNs may be different from their intraday indicative value.

2.  **The investor fee rate** per ETN is 0.89% per year. The investor fee on the inception date was zero. On each subsequent calendar day until maturity or early redemption, the investor fee will be equal to (1) The Investor Fee Rate *times* (2) the closing indicative note value on the immediately preceding calendar day *times* (3) the daily index factor on that day (or, if such day is not an index business day, one) *divided by* (4) 365. The daily index factor on any index business day will equal (1) the closing level of the Index on such index business day *divided by* (2) the closing level of the Index on the immediately preceding business day.

3.  **Market Capitalization** = Closing Indicative Note Value x ETNs Outstanding

ETN and Index Historical Performance



Source: Barclays. Index Base Date is October 2005, Index Live Date is July 2015. All data prior to the Index Live Date is historically simulated data. Historical and hypothetical performance is not indicative of future performance. Performance data do not reflect trading costs and also do not reflect additional fees that may apply to an index swap transaction. See Historical Index Performance Disclaimer for further information.

## Index and ETN Returns (as of 01/31/2018)

|  | 1 mo | 3 mo | 6 mo | YTD | 1 yr | 3 yrs | Since Inception |
|---|---|---|---|---|---|---|---|
| S&P 500 VIX Short-Term Futures™ Index TR | 5.86% | -11.97% | -32.55% | 5.86% | -61.31% | -62.46% | -59.13% |
| ETN Closing Indicative Note Value Return | 5.78% | -12.17% | -32.85% | 5.78% | -61.65% | -62.79% | -59.49% |

## ETN Market Price Returns (as of 01/31/2018)

|  | 1 mo | 3 mo | 6 mo | YTD | 1 yr | 3 yrs | Since Inception |
|---|---|---|---|---|---|---|---|
| iPath®S&P 500 VIX Short-Term Futures™ ETN | 7.36% | -11.64% | -33.21% | 7.36% | -61.43% | -62.97% | -44.86% |

Source: Barclays. Index Base Date is October 2005, Index Live Date is July 2015. All data prior to the Index Live Date is historically simulated data. Historical and hypothetical performance is not indicative of future performance. Performance data do not reflect trading costs and also do not reflect additional fees that may apply to an index swap transaction. See Historical Index Performance Disclaimer for further information.

## Correlations (as of 01/31/2018)

| Index | Correlations[*] |
|---|---|
| S&P 500 VIX Short-Term Futures™ Index TR | 1.00 |
| Barclays US Aggregate Bond Index | -0.03 |
| Bloomberg Commodity Index Total Return[SM] | -0.15 |
| MSCI Emerging Markets Net Total Return Index | -0.48 |
| MSCI EAFE® Net Total Return Index | -0.71 |
| S&P 500® Total Return Index | -0.75 |

Sources: Bloomberg Finance L.P., Barclays, MSCI Inc., S&P Dow Jones Indices LLC. Correlations are calculated on a monthly basis over a 5-year period from the "as of" date referenced above.

[*] Correlation is a term used to describe the statistical relationship between two or more quantities or variables. Perfectly correlated assets will have a correlation coefficient of one, while the correlation coefficient will be zero when returns on two assets are completely independent.

**Index correlations are for illustrative purposes only and do not represent actual ETN performance. PAST PERFORMANCE IS NOT INDICATIVE FOR FUTURE RESULTS.**

- The S&P 500® Index is intended to provide an indication of the pattern of stock price movement in the U.S. equities market.
- The Bloomberg Commodity Index Total Return[SM] reflects the returns that are potentially available through an unleveraged investment in the futures contracts on physical commodities comprising the index plus the rate of interest that could be earned on cash collateral invested in specified Treasury Bills.
- The MSCI EAFE Index is an equity index which captures large and mid cap representation across Developed Markets countries around the world, excluding the US and Canada
- The MSCI Emerging Markets Index[SM] captures large and mid cap representation across 21 Emerging Markets countries.
- The Barclays U.S. Aggregate Bond Index provides a measure of the performance of the U.S. investment grade bonds market.

## Index Components (as of 01/31/2018)

| Index Components | Weightings % |
|---|---|
| CBOE VIX Future MAR 18 | 55.36% |
| CBOE VIX Future FEB 18 | 44.64% |

Source: S&P Dow Jones Indices LLC, subject to change.

Selected Risk Considerations

An investment in the iPath ETNs described herein (the "ETNs") involves risks, including possible loss of principal, and may not be suitable for all investors. Selected risks are summarized here and select product specific risk factors are summarized under "Select Risk Considerations" on the relevant product pages, but we urge you to read the more detailed explanation of risks described under "Risk Factors" in the applicable product prospectus.

**You May Lose Some or All of Your Principal:** The ETNs are exposed to any decrease in the level of the underlying index between the inception date and the applicable valuation date. Additionally, if the level of the underlying index is insufficient to offset the negative effect of the investor fee and other applicable costs, you will lose some or all of your investment at maturity or upon redemption, even if the value of such index level has increased or decreased, as the case may be. Because the ETNs are subject to an investor fee and other applicable costs, the return on the ETNs will always be lower than the total return on a direct investment in the index components. **The ETNs are riskier than ordinary unsecured debt securities and have no principal protection.**

**Credit of Barclays Bank PLC:** The ETNs are unsecured debt obligations of the issuer, Barclays Bank PLC, and are not, either directly or indirectly, an obligation of or guaranteed by any third party. Any payment to be made on the ETNs, including any payment at maturity or upon redemption, depends on the ability of Barclays Bank PLC to satisfy its obligations as they come due. As a result, the actual and perceived creditworthiness of Barclays Bank PLC will affect the market value, if any, of the ETNs prior to maturity or redemption. In addition, in the event Barclays Bank PLC were to default on its obligations, you may not receive any amounts owed to you under the terms of the ETNs.

**The Performance of the Underlying Indices are Unpredictable:** An investment in the ETNs is subject to risks associated with fluctuations, particularly a decline, in the performance of the underlying index. Because the performance of such index is linked to futures contracts on the CBOE® Volatility Index (the "VIX Index"), the performance of the underlying index will depend on many factors including, the level of the S&P 500® Index, the prices of options on the S&P 500® Index, and the level of the VIX Index which may change unpredictably, affecting the value of futures contracts on the VIX Index and, consequently, the level of the underlying index. Additional factors that may contribute to fluctuations in the level of such index include prevailing market prices and forward volatility levels of the U.S. stock markets and the equity securities included in the S&P 500® Index, the prevailing market prices of options on the VIX Index, relevant futures contracts on the VIX Index, or any other financial instruments related to the S&P 500® Index and the VIX Index, interest rates, supply and demand in the listed and over-the-counter equity derivative markets as well as hedging activities in the equity-linked structured product markets.

**Your ETNs Are Not Linked to the VIX Index:** The value of your ETNs will be linked to the value of the underlying index, and your ability to benefit from any rise or fall in the level of the VIX Index is limited. The index underlying your ETNs is based upon holding a rolling long position in futures on the VIX Index. These futures will not necessarily track the performance of the VIX Index. Your ETNs may not benefit from increases in the level of the VIX Index because such increases will not necessarily cause the level of VIX Index futures to rise. Accordingly, a hypothetical investment that was linked directly to the VIX Index could generate a higher return than your investment in the ETNs.

**Market and Volatility Risk:** The market value of the ETNs may be influenced by many unpredictable factors and may fluctuate between the date you purchase them and the maturity date or redemption date. You may also sustain a significant loss if you sell your ETNs in the secondary market. Factors that may influence the market value of the ETNs include prevailing market prices of the U.S. stock markets, the index components included in the underlying index, and prevailing market prices of options on such index or any other financial instruments related to such index; and supply and demand for the ETNs, including economic, financial, political, regulatory, geographical or judicial events that affect the level of such index or other financial instruments related to such index.

**A Trading Market for the ETNs May Not Develop:** Although the ETNs are listed on a U.S. national securities exchange, a trading market for the ETNs may not develop and the liquidity of the ETNs may be limited, as we are not required to maintain any listing of the ETNs.

**No Interest Payments from the ETNs:** You may not receive any interest payments on the ETNs.

**Restrictions on the Minimum Number of ETNs and Date Restrictions for Redemptions:** You must redeem at least 25,000 ETNs of the same series at one time in order to exercise your right to redeem your ETNs on any redemption date. You may only redeem your ETNs on a redemption date if we receive a notice of redemption from you by certain dates and times as set forth in the product prospectus.

**Uncertain Tax Treatment:** Significant aspects of the tax treatment of the ETNs are uncertain. You should consult your own tax advisor about your own tax situation.

The ETNs may be sold throughout the day on the exchange through any brokerage account. Commissions may apply and there are tax consequences in the event of sale, redemption or maturity of ETNs.

The S&P 500 VIX Futures Indices are products of S&P Dow Jones Indices LLC ("SPDJI"). S&P®, S&P 500®, and "S&P 500 VIX Short-Term Futures™", "S&P 500 VIX Mid-Term Futures™" and "S&P 500® Dynamic VIX Futures™" are trademarks of Standard & Poors Financial Services LLC ("SPFS"). VIX® is a registered trademark of Chicago Board Options Exchange, Incorporated ("CBOE"). These trademarks have been licensed to S&P Dow Jones Indices LLC ("SPDJI") and its affiliates, and sublicensed to Barclays Bank PLC for certain purposes. The ETNs are not sponsored, endorsed, sold or promoted by SPDJI, SPFS, CBOE or any of their respective affiliates (collectively, "S&P Dow Jones Indices"). S&P Dow Jones Indices does not make any representation or warranty, express or implied, to the owners of the ETNs or any member of the public regarding the advisability of investing in securities generally or in the ETNs particularly or the ability of the S&P 500 VIX Futures Indices to track general market performance.

© 2017 Barclays Bank PLC. All rights reserved. iPath, iPath ETNs and the iPath logo are registered trademarks of Barclays Bank PLC. All other trademarks, servicemarks or registered trademarks are the property, and used with the permission, of their respective owners.

NOT FDIC INSURED • NO BANK GUARANTEE • MAY LOSE VALUE

# Exhibit 2

**The New York Times** | https://nyti.ms/2vDvijX

# DealBook/ Business & Policy

# Day Trading in Wall Street's Complex 'Fear Gauge' Proliferates

By LANDON THOMAS Jr.    AUG. 28, 2017

Each morning, at the market's open, Seth M. Golden, a former logistics manager at a Target store, fires up the computer in his home office in northern Florida and does what he has done for years: Put on bets that Wall Street's index of volatility, the VIX, will keep falling.

It has been a lucrative strategy as the so-called fear gauge has been, outside of the occasional spike, largely fearless — confounding experts by sloping persistently downward and in the process making Mr. Golden a multimillionaire.

"There has been a lot of white noise," said Mr. Golden last Tuesday on a day that the VIX plummeted more than 10 percent, allowing him to lock in profits from short trades. "You had North Korea, Afghanistan, Trump people resigning. But I was never nervous — so today I just sat back, ate some popcorn and cashed in my profits."

On Monday, the index ticked up, after falling 8 percent on Friday, as investors took the view that the Fed would not be raising interest rates soon after a speech by Janet L. Yellen, the chairwoman of the Federal Reserve.

Day Trading in Wall Street's Complex 'Fear Gauge' Proliferates - The New York Times

Twenty years ago, when the shares of dot-com and tech companies soared and swooned, investors loading up on hot tech stocks would define the speculative fever of that era. Across the country, people quit their day jobs to trade the likes of Webvan and eToys from their living rooms or glittery new E-Trade outlets.

Now, a new generation of day traders, deploying an expanding array of opaque, high-risk, high-return trading vehicles concocted by Wall Street, are pouring into one of the market's most arcane corners, making bets on whether the VIX — otherwise known as the Chicago Board Options Exchange Volatility Index — will rise or fall.

Wagering on the fear gauge, a measure of how volatile investors expect stock markets to be in the month ahead, has traditionally been the province of highly specialized investors with the cash and financial relationships to purchase the derivatives that facilitate these trades.

In the years after the financial crisis, however, investment banks like Barclays and Credit Suisse came out with VIX-linked investments that investors could purchase on the stock exchange, just as if they were buying shares of IBM or Microsoft.

Called exchange traded notes, they were a racier version of the exchange traded funds, or E.T.F.s, that track every variety of index and investment strategy and now have more than $4 trillion in investor assets.

Led by Barclays iPath S&P 500 Short Term Futures ETN (VXX), these investments have attracted over $14 billion in investor flows since 2012, according to FactSet, a data-gathering firm.

There are now more than 30 different VIX-themed investment choices (including some that use leverage, amplifying gains and losses) that investors can snap up on a public exchange.

Because they are so easy to trade and because the question driving the trade — Will the markets succumb to fear or won't they? — borders on the existential, a new wave of millennial day traders has been at the forefront of this trade.

Day Trading in Wall Street's Complex 'Fear Gauge' Proliferates - The New York Times

And many are using Stock Twits, the social media investing website embraced by stay-at-home investors, as well as Twitter and Facebook to passionately promote their strategies.

"You could describe it as a cult — it is about how you define and measure fear and can you trade it," said David Moadel, an independent trader who uses social media to identify and interview emerging investors.

But this explosion in interest is prompting concerns that investors may not be truly aware of what they are getting into.

Today, VIX-themed entities are among the most actively traded securities on the public stock markets. The Barclays iPath note, Ultra VIX Short Term Futures (UVXY) by Pro Shares, and Daily 2X VIX ETN (TVIX) and Daily Inverse VIX ETN (XIV), both by Velocity Shares, are frequently among the most widely traded stocks of the day.

In theory, the murky nomenclature of these investments ought to be warning enough for amateur investors to tread with caution. And it is also true that the fund prospectuses warn bluntly that investors can lose large sums of money if they buy and hold these investments.

Robert E. Whaley, a financial professor at Vanderbilt University, who is known in volatility circles as the "father of the VIX," for the work he did in helping the Chicago Board Options Exchange develop the index, says he has told the Securities and Exchange Commission that these securities are too risky for many nonprofessional investors.

"These are incredibly complex products when you consider their price dynamics," Mr. Whaley said. "The volume in these things is huge, and my concern is that investors don't understand what they are and how their prices behave."

The S.E.C. has in the past publicly warned investors about the risky nature of these types of investments.

Indeed, the most popular of the funds, the Barclays iPath fund, known broadly by its ticker symbol VXX, has since its inception averaged a yearly return of negative

Day Trading in Wall Street's Complex 'Fear Gauge' Proliferates - The New York Times

58 percent, according to FactSet.

Or look at it this way: If an investor bought VXX when it came to market in 2009 and held onto it until now, that investor would have lost 99 percent of his investment.

While many professionals will purchase these securities to hedge their exposure to the stock market, analysts say that day traders are now using them to gamble on a sharp spike in the VIX.

"You have seen this infusion of millennials coming in and buying VXX and UVXY," Mr. Moadel said, referring to the main VIX product and its leveraged cousin. "But most of the time they just get killed."

Doing the killing, so to speak, have been investors like Mr. Golden, who consistently shorts VXX and UVXY whenever they spike upward.

His bet is founded on two principles: one being that VXX and UVXY, because they track a basket of VIX futures, not the index itself, will decline in value over time as the contracts expire.

He describes it as a heavy anvil weighing down on the value of each security.

Mr. Golden also believes that in the decades since the VIX was introduced in 1993, its long-term trend has been to push consistently downward. Yes, there will be spikes as during major cataclysms (9/11, the 2008 financial crisis) and other less tumultuous events (a devaluation in China, a North Korea crisis or even a presidential tweet).

But after every spike of fear must follow a longer period of calm, Mr. Golden contends, which, he argues, is a perfect scenario if your bias is to always bet against fear.

"The nature of volatility is that it desensitizes over time," he said. "Which is why the index has been tracking down for so long."

Just as the frenetic buying of tech stocks by day traders in 1999 and 2000 came to be seen as a major factor behind the boom and bust, market experts say that traders like Mr. Golden who persistently short the VIX have distorted the market.

"The VIX spikes have become more extreme — on the upside and the downside," said Salil Aggarwal, a derivatives strategist at Deutsche Bank.

Mr. Golden, who is 40, lives in a suburb of Ocala, Fla. Since he has been shorting VIX, he says his net worth has gone to $12 million from $500,000 in about five years.

When it comes to his craft, he is more the pedant than boastful trader, carefully posting snapshots of his trades on his Twitter feed and churning out dense treatises and videos laying out his methods. The best part of his day, he says, is picking up his toddler daughter from day care.

But, as with any trader on a roll, he likes to keep score, and he is quick to spar on Twitter with the traders who appear on CNBC's "Fast Money" program.

Now, he is starting a hedge fund dedicated to wagering against the VIX. Investors, he says, have been pounding on his door to get in early, offering him $100 million for starters.

That is a lot of money for a onetime Target manager.

"Yes, it is a crowded trade," Mr. Golden acknowledged. "But I don't worry about crowds — I just worry what the next existential shock might be."

### Correction: August 28, 2017

An earlier version of this article misstated where Salil Aggarwal, a derivatives strategist, works. It is Deutsche Bank, not Barclays.

A version of this article appears in print on August 29, 2017, on Page B1 of the New York edition with the headline: Day Traders Bet on Fear In an Obscure Market Niche.

© 2018 The New York Times Company